725 F.2d 1422
 20 ERC 1305, 233 U.S.App.D.C. 316, 14
Envtl. L. Rep. 20,199
 SAVE OUR CUMBERLAND MOUNTAINS, INC., Council of Southern
Mountains, Inc., Virginia Citizens For Better
Reclamation, Appellants,
v.
William P. CLARK, in his official capacity as Secretary of
the Interior, et al.
 No. 83-1008.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1983.
Decided Jan. 20, 1984.
Rehearing Denied April 2, 1984
Rehearing En Banc Granted April 2, 1984.*
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 81-2238).
 Joseph A. Yablonski, Washington, D.C., with whom Daniel B. Edelman and L. Thomas Galloway, Washington, D.C., were on the brief, for appellants.
 Roger Marzulla, Atty., U.S. Dept. of Justice, Washington, D.C., for appellees. Carol E. Dinkins, Asst. Atty. Gen., and Robert L. Klarquist, Alfred T. Ghiorzi, and Jennele M. Morris, Attys., U.S. Dept. of Justice, and Harold P. Quinn, Jr., Atty., U.S. Dept. of Interior, Washington, D.C., were on the brief for appellees.
 Before TAMM and WILKEY, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 Appellants, three environmental citizens organizations (hereinafter referred to collectively as SOCM),[1] brought this action alleging that the Secretary of the Interior (the Secretary) and the Director of the Office of Surface Mining (the Director)[2] had unlawfully failed to implement and enforce the Surface Mining Control and Reclamation Act of 1977 (the Act), 30 U.S.C. Secs. 1201-1328 (Supp. V 1981).[3] SOCM claimed that the Secretary unlawfully withdrew a regulation construing an exemption from the Act known as the "two-acre exemption," and that the Secretary failed to enforce the Act against miners that were improperly claiming this exemption. Appellants raise two issues on appeal. First, they contest the district court's ruling that venue for the claims against the Secretary for failure to perform mandatory duties was improper under the venue provision found in section 520(c)(1) of the Act. Second, appellants dispute the court's holding that the challenge to the withdrawal of the regulation was mooted by the agency's subsequent promulgation of a regulation covering the same subject matter. We agree with the reasoning of United States District Judge Charles R. Richey and, accordingly, affirm both district court orders.
 
 I. BACKGROUND
 
 2
 The Surface Mining Control and Reclamation Act of 1977 established a comprehensive program designed to "protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. Sec. 1202(a). Title II of the Act creates the Office of Surface Mining Reclamation and Enforcement (OSM) and delegates to the Secretary of the Interior, acting through OSM, primary responsibility for administering and enforcing the Act.[4] Title V of the Act sets out detailed environmental protection performance standards for surface mining operations. No entity may engage in a surface mining or reclamation operation without first obtaining from the appropriate regulatory authority a permit assuring compliance with these standards. 30 U.S.C. Sec. 1265. In Title IV of the Act, Congress established the Abandoned Mine Reclamation Fund (Fund). All mine operators are required to pay into the Fund a fee based on tonnage of coal mined. The money in the Fund is to be used to defray the costs of restoring lands damaged by mining activities. 30 U.S.C. Sec. 1232. The Secretary of the Interior is responsible for promulgating regulations to implement these provisions of the Act.
 
 
 3
 Congress specifically exempted from the terms of the Act "the extraction of coal for commercial purposes where the surface mining operation affects two acres or less." 30 U.S.C. Sec. 1278(2) (the two-acre exemption). Thus, miners affecting less than two acres need not obtain permits or pay fees into the Fund. The dispute in this case arises out of the Secretary's actions with respect to the implementation and enforcement of this exemption.
 
 
 4
 The OSM first promulgated a regulation construing the applicability of the two-acre exemption in March 1979. The regulation excluded from the scope of the two-acre exemption "any ... operation conducted by a person who affects or intends to affect more than two acres at physically related sites, or any ... operation conducted by a person who affects or intends to affect more than two acres at physically unrelated sites within one year." 30 C.F.R. Sec. 700.11(b) (1982).
 
 
 5
 On November 27, 1979, OSM suspended the portion of the regulation that applied to "physically unrelated sites." 44 Fed.Reg. 67,942 (1979).[5] Subsequently, in January 1981, the Secretary published a second two-acre rule. This rule, which supplemented the remaining portion of the first rule, adopted specific criteria for determining whether mining operations that are not physically connected are nevertheless related for purposes of determining whether they are exempt. 46 Fed.Reg. 7,902 (1981).
 
 
 6
 The second two-acre rule never went into effect. First, in compliance with a memorandum issued by President Reagan,[6] the Secretary postponed the effective date of the second two-acre rule to March 30, 1981. 46 Fed.Reg. 10,707 (1981). On March 23, 1981, however, OSM suspended the second two-acre rule, without notice and comment, pending the outcome of rulemaking.[7] 46 Fed.Reg. 18,023 (1981). On April 3, 1981, OSM cancelled the March 23 notice of suspension and deferred the effective date of the rule until May 4, 1981. The notice also solicited comments on a proposed indefinite suspension of the rule.[8] 46 Fed.Reg. 20,211 (1981). After two more extensions of its effective date, the second two-acre rule was withdrawn. 46 Fed.Reg. 40,650, 40,651 (1981).
 
 
 7
 Appellants filed this action in the district court on September 15, 1981. Count I of the complaint alleged that the suspension and withdrawal of the second two-acre rule was arbitrary and capricious and violated the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553 (1982). Appellants sought an order reinstating that regulation. Counts II and III of the complaint alleged that the appellees violated the Act by failing to perform inspections, institute enforcement procedures, and collect reclamation fees at hundreds of mining operations that were evading the terms of the Act by improperly claiming the two-acre exemption.[9] Jurisdiction for the action was based on sections 520(a)(2) and 526(a)(1) of the Act. 30 U.S.C. Sec. 1270(a)(2) and 30 U.S.C. Sec. 1276(a)(1). The complaint also alleged jurisdiction under 28 U.S.C. Secs. 1331, 1337, 1361, 2201, and 2202 (1976 & Supp. V 1981).
 
 
 8
 On July 8, 1982, the district court granted appellees' motion to dismiss counts II and III for lack of venue.[10] The court ruled that the claims alleged in counts II and III were subject to the specific venue provision in section 520(c)(1) of the Act, 30 U.S.C. Sec. 1270(c)(1). Therefore, the court agreed that SOCM could bring these claims only in the districts where the mining operations that were allegedly evading the Act were located. Since none of these operations were located in the District of Columbia, the court found that venue was improper. Save Our Cumberland Mountains, Inc. v. Watt, No. 81-2238 (D.D.C. July 8, 1982), J.A. at 19.
 
 
 9
 The district court then directed the parties to file cross motions for summary judgment on count I, the only remaining claim. On August 2, 1982, three days after SOCM filed its motion, OSM promulgated a new two-acre rule (the third two-acre regulation).[11] The district court ruled that the adoption of the third two-acre rule mooted the controversy. By order dated October 28, 1982, count I was dismissed. Save Our Cumberland Mountains, Inc. v. Watt, 558 F.Supp. 22 (D.D.C.1982).
 
 
 10
 SOCM appeals both district court orders.
 
 II. VENUE ANALYSIS
 
 11
 We first review the district court's dismissal of counts II and III for lack of venue. The issue before us is the proper interpretation and application of the specific venue requirement contained in the citizens' suit provision of the Act.
 
 
 12
 The citizens' suit provision authorizes private persons to bring two types of civil actions to compel compliance with the Act. Section 520(a)(1), 30 U.S.C. Sec. 1270(a)(1), states that persons having an interest which may be adversely affected may bring a civil action against any entity (including any governmental authority) for violations of the Act or any rule, regulation, order or permit issued thereunder. Section 520(a)(2) provides for actions against the Secretary, or other regulatory authority, for failure to perform nondiscretionary duties.[12] The claims asserted in counts II and III fall clearly within the purview of section 520(a)(2).
 
 
 13
 The venue provision at issue, found in section 520(c)(1), provides: "Any action respecting a violation of this chapter or the regulations thereunder may be brought only in the judicial district in which the surface coal mining operation complained of is located." 30 U.S.C. Sec. 1270(c)(1).[13] The district court found, and appellees contend, that this venue provision applies on its face to citizens' actions brought under section 520(a)(2). The district court further concluded the venue provision applies to actions seeking to compel the Secretary to perform duties required by the Act brought pursuant to any other jurisdictional statute. Save Our Cumberland Mountains, Inc. v. Watt, No. 81-2238 (D.D.C. July 8, 1982).A.
 
 
 14
 To ascertain the intended scope of any statutory provision, we look first to the language used by Congress. CBS, Inc. v. FCC, 453 U.S. 367, 377, 101 S.Ct. 2813, 2820, 69 L.Ed.2d 706 (1981); Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). We ascribe to words their plain and ordinary meaning absent convincing reasons to the contrary. Burns v. Alcala, 420 U.S. 575, 580-81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975); Symons v. Chrysler Corp. Loan Guarantee Board, 670 F.2d 238, 241 (D.C.Cir.1981).[14] By its terms, the venue provision is broad in scope: it applies to "any action respecting a violation of [this Act]." 30 U.S.C. Sec. 1270(c)(1) (emphasis added). The words do not restrict the venue provision's application to specific actions based either on their subject matter or on their jurisdictional underpinnings.
 
 
 15
 Appellants assert, however, that other language in section 520(c)(1) evidences Congress's intent to limit venue only in actions against individual mining operations. They submit, first, that because the venue provision refers to a "violation" of the Act, it applies only to actions under section 520(a)(1), which authorizes suits against entities that are "alleged to be in 'violation' of [the Act]." 30 U.S.C. Sec. 1270(a)(1) (emphasis added). In their view, "violation" refers only to infractions of the Act by mining operations. They point out that "violation" is used several times in the Act in reference to mine operators or mining operations.[15] Relying on the principle that like terms should be given the same meaning throughout a statute, SOCM suggests that only a mine operator can be in violation of the Act.
 
 
 16
 Appellants' argument is based solely on the location of the term violation in relation to mining operations. The location of a word, however, need not restrict its plain meaning. While it is undeniably important to consider the context of statutory language when construing its meaning, the words themselves are the best indicator of legislative intent. See AFL-CIO v. Marshall, 570 F.2d 1030, 1036 (D.C.Cir.1978).
 
 
 17
 The plain meaning of "violation" indicates that it encompasses the Secretary's, as well as miners', actions. A statute is violated when one transgresses its terms. When the Secretary fails to perform a duty required by the Act, he has transgressed the Act's affirmative mandate; that is, he has "violated" the Act. The Secretary's functions and responsibilities, with respect to the issues in this case, derive solely from the Act. The Secretary's alleged failure to perform these duties can thus only be interpreted as a violation of the Act.
 
 
 18
 Further, a close examination of the Act does not support appellants' contention that "violation" appears only in connection with mine operators. The term is also used in section 520(b)(2), which specifically refers to an action against the Secretary brought pursuant to section 520(a)(2) for failure to perform a mandatory duty under the Act. Section 520(b)(2) requires that plaintiffs give sixty days' notice before commencing such an action except "where the violation or order complained of constitutes an imminent threat to the health or safety of the plaintiff ...." 30 U.S.C. 1270(b)(2) (emphasis added). Moreover, in subsection 520(f), the Act provides for an action for damages by any person who is injured "through the violation by any operator of any rule, regulation, order or permit issued pursuant to [the Act]." 30 U.S.C. Sec. 1270(f). The modification of "violation" with the phrase "by any operator" indicates that Congress did not intend "violation" to refer only to operators.
 
 
 19
 Thus, both the plain meaning and the contextual use of the disputed term lead to a conclusion that the Secretary's failure to perform required duties is a violation of the Act. We therefore do not believe that the use of "violation" in the venue provision indicates a congressional intention to limit the application of that provision to actions against mining operations under subsection 520(a)(1).
 
 
 20
 To bolster its position that the venue provision applies only to actions against miners, SOCM points to additional language in subsection 520(c)(1). The provision states that actions "may be brought only in the judicial district in which the surface mining operation complained of is located." 30 U.S.C. Sec. 1270(c)(1) (emphasis added). SOCM concludes that this language indicates Congress's intent to apply the limited venue provision only where the suit "complains of" the activities of a particular mining operation.
 
 
 21
 We must read the language cited by SOCM in the context of the entire provision. Section 520(c)(1) limits venue in "any action respecting a violation of this Act." This all-encompassing language evidences an intent that the provision be applied broadly. It is unlikely, therefore, that Congress added the cited phrase for the purpose of limiting the provision's scope.
 
 
 22
 In light of the lack of extrinsic evidence explaining the intended purpose of this language, we accept the approach apparently adopted by the district court as the most reasonable effectuation of the entire provision. See Symons, 670 F.2d at 242. In the context of an action against the Secretary for failure to perform mandatory duties, the district court apparently concluded that the cited phrase directs courts to look to the underlying factual situation in determining the proper venue. In the instant case, for example, SOCM "complains of" noncompliance by the Secretary; however, these claims are ultimately based on the underlying allegation that hundreds of mine operators are evading the terms of the Act. Thus, even in the context of the Secretary's failure to perform mandatory duties, the claim at bottom is referenced to specific mining operations. The district court's interpretation gives meaning to the cited words while adhering to the evident intent that the provision be broadly applied.[16]
 
 
 23
 This view of the venue requirement comports with a congressional preference for local judicial review where the action potentially involves site-specific or local conditions. This preference is discernable in numerous other venue provisions throughout the Act. For example, section 526(a)(1), 30 U.S.C. Sec. 1276(a)(1), provides that actions regarding the Secretary's approval or disapproval of a state program shall be subject to review in the district that includes the capital of that state.
 
 
 24
 While the appellants' suggestion that it is in the interest of judicial economy and otherwise practical to bring a single action in this district to remedy an allegedly nationwide problem is attractive, Congress's plain language does not allow this result. There are compelling reasons supporting Congress's apparent preference to have this type of dispute adjudicated in the various districts in which the noncomplying mines are located: it allows the operators more easily to become involved, it allows consideration of site-specific factors, and it distributes more evenly the judicial workload.[17]
 
 
 25
 In short, we cannot say that the language relied on by SOCM indicates an intent to apply the specific venue requirement only in actions involving discrete mining operations.
 
 B.
 
 26
 Alternatively, SOCM contends that even if section 520(c)(1) applies to actions against the Secretary for failure to perform nondiscretionary duties brought under section 520(a)(2), it does not restrict venue in actions, such as this one, in which jurisdiction is derived from a source other than the citizens' suit provision of the Act.[18]
 
 
 27
 Appellants' assertion requires a strained reading of section 520(c)(1). In effect, SOCM asks us to read the first portion of the provision as "any action pursuant to this section," rather than "any action respecting a violation of [this Act]." The plain language of the provision contradicts SOCM's contention.
 
 
 28
 The legislative history, while sparse, supports our reading of the venue requirement. Congress expressly rejected language that would have required the result appellants seek. In the Senate version of the Act, the venue provision stated "any action pursuant to this section may be brought only in the judicial district in which the surface coal mining operation complained of is located." S. 7, 95th Cong., 1st Sess. Sec. 420(c)(1), 123 Cong.Rec. 15,793 (1977) (emphasis added).[19] This language clearly indicated an intent that the specific venue requirement be applied only to actions brought pursuant to the citizens' suit provision. Congress, however, adopted the broader provision that originally appeared in the House bill.[20] Although there is no explanation for the adoption of the broader provision, we may not assume that Congress took this action "for no reason at all." Ashton v. Pierce, 716 F.2d 56, 62 (D.C.Cir.1983). Congress's rejection of the more narrow Senate version is indicative of an intent to apply the restrictive venue provision to all actions.
 
 
 29
 Thus, both the plain language of the provision and the legislative history lead us to conclude that Congress intended to restrict venue in all actions regarding violations of the Act, whatever the jurisdictional basis.
 
 
 30
 Nevertheless, appellants assert that the savings clause in subsection 520(e)[21] preserves their right to bring actions grounded on the Secretary's violation of this Act through other jurisdictional statutes. Such actions, they contend, are governed by the general venue statute, 28 U.S.C. Sec. 1391, and are not limited by the venue provision in section 520(c)(1).
 
 
 31
 The legislative history provides no evidence that by enacting the savings clause Congress intended to limit the application of the specific venue provision in section 520(c)(1). The House Committee report, in an apparent reference to the savings clause, stated only that the citizens' suit provision "does not affect any rights including the right to bring suit or remedies that the person bringing the suit may have under any other law." H.R.Rep. No. 218, 95th Cong., 1st Sess. 90 (1977), U.S.Code Cong. & Admin.News 1977, pp. 593, 626. The report makes no mention of the venue provision.
 
 
 32
 The only other relevant evidence in the legislative history concerns a change in the language of the savings clause. The savings clause in the Act as initially reported by the House Committee on Interior and Insular Affairs specified that the citizens' suit section was "the sole basis of jurisdiction for suits under subsection (a)(2) ... and failure to comply with the notice requirement of subsection (b)(2) shall require dismissal of the action." H. 2, 95th Cong., 1st Sess. Sec. 520(c)(1), 123 Cong.Rec. 12,672 (1977).[22] The deletion of the limiting language from the final version of the Act indicates only that Congress did not wish to restrict rights conferred by other statutes or laws to bring actions against the Secretary.[23] It does not manifest a congressional intent to qualify the plain meaning of the venue provision. Applying the restrictive venue clause to actions against the Secretary for noncompliance with this Act, regardless of the jurisdictional basis, will not eviscerate the savings clause. This venue provision does not restrict any rights or remedies appellants might have in the absence of the citizens' suit provision: it merely specifies the appropriate court in which to compel the Secretary to perform mandatory duties under the Act.[24]
 
 
 33
 We reject SOCM's contention that this court's interpretation of a similar citizens' suit provision in Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692 (D.C.Cir.1975), mandates the opposite conclusion. In Train, this court ruled that the limitations contained within the citizens' suit provision of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. Sec. 1365 (1976 & Supp. V 1981) (FWPCA), applied only to actions brought pursuant to that provision and not to actions that would have been maintainable in the absence of that provision. 510 F.2d at 701. In contrast to the venue requirement in this case, the limitations contained in the citizens' suit provision at issue in Train by their terms applied only to actions brought under that provision.[25]
 
 
 34
 Moreover, we are guided by the basic principle of statutory construction that a statute dealing with a narrow, specific subject typically prevails over a general statute. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (citations omitted). See Radzanower v. Touche Ross & Co., 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976) (quoting and explaining Morton ). We thus conclude that in any action against the Secretary for failure to perform duties required by this Act, whether brought pursuant to the citizens' suit provision's grant of jurisdiction or under any other jurisdictional statute, the specific venue provision in 520(c)(1) prevails over the general venue rules of 28 U.S.C. Sec. 1391.
 
 C.
 
 35
 Finally, we must also reject appellants' "pendent venue" theory. On occasion, where venue exists for the principal cause of action, courts have agreed to adjudicate closely related claims even if they lacked an independent source of venue. See, e.g., Laffey v. Northwest Airlines, Inc., 321 F.Supp. 1041, 1042 (D.D.C.1971). The rationale for this "pendent venue" theory is that it is more efficient for one court to adjudicate all claims involving substantially the same proofs. See 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3808 (1976). In this case, the principal claim, count I, involves a procedural challenge under the APA to the suspension and withdrawal of the two-acre regulation. The allegedly "pendent" claims concern the Secretary's actions with regard to certain mandates within the Act. The proofs necessary to adjudicate these three claims are wholly dissimilar. We cannot conclude that these claims are so closely related that they justify adoption of a pendent venue theory.
 
 
 36
 In sum, we conclude that SOCM's claims against the Secretary for failure to perform mandatory duties are governed by the Act's specific venue provisions. Accordingly, we affirm the district court's dismissal, for lack of venue, of counts II and III of the complaint.
 
 III. MOOTNESS
 
 37
 SOCM asserts that the district court erred in dismissing as moot its challenge to the Secretary's suspension and withdrawal of the second two-acre rule. We agree with the district court's conclusion that the claim is moot. Integral to our decision is that the promulgation of a third two-acre rule, with opportunity for notice and comment, provided effective relief for the alleged illegality.[26]
 
 
 38
 Courts lack jurisdiction to adjudicate claims that have been "mooted by subsequent developments ...." Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968) (footnote omitted). In order to dismiss a claim as moot, two conditions must be met. First, the court must find that " 'there is no reasonable expectation ...' that the alleged violation will recur." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Second, it must be clear that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." 440 U.S. at 631, 99 S.Ct. at 1383.
 
 
 39
 SOCM makes no claim that the alleged violation will recur. Thus, the sole issue is whether subsequent events, in this case the promulgation of the new rule, "completely eradicates" the effects of the allegedly unlawful suspension and withdrawal of the second rule.[27]
 
 
 40
 SOCM complains that the Secretary's suspension and withdrawal of the second two-acre rule was unlawful because it violated the notice and comment requirements of the APA.[28] Thus, appellants challenge only the procedure by which the rule was withdrawn. The primary effect of this procedural defect was to deprive appellants of the opportunity to participate in the rulemaking process. See Natural Resources Defense Council v. United States Nuclear Regulatory Comm'n, 680 F.2d 810, 814-15 (D.C.Cir.1982).[29]
 
 
 41
 Appellants received the opportunity to participate meaningfully in the rulemaking process concerning the two-acre exemption when the Secretary promulgated the third two-acre rule in accordance with the notice and comment requirements of the APA.[30] As in Natural Resources Defense Council, we conclude that appellants have received all the relief necessary to eradicate the effects of the allegedly unlawful rulemaking.[31] Thus, SOCM's claim is moot.
 
 
 42
 We reject appellants' assertion that promulgation of the third rule did not moot the claim because the district court had the power to provide additional relief by reinstating the second rule from the date it was to become effective until the effective date of the new rule. SOCM contends that the allegedly improper withdrawal caused "rampant abuses of the two-acre exemption." Reply Brief for Appellants at 20. It argues that these abuses can be remedied only if the Secretary enforces the Act against operators that improperly claimed the exemption by collecting reclamation fees and requiring compliance with the Act's standards. According to SOCM, reinstatement of the second rule would provide a simple means for determining which operators were violating the Act. We believe this argument mischaracterizes the deprivation caused by a procedural defect in the withdrawal of a rule. As noted above, the loss appellants suffered was the loss of opportunity to participate. They have now received that opportunity.
 
 
 43
 Even if we were to characterize the deprivation caused by an alleged procedural defect in withdrawing a rule to include the potential beneficial effects the existence of the rule would have insured, appellants' claim would still be moot. The withdrawal of the second two-acre rule, which had never even gone into effect, was not necessarily a direct cause of unlawful claims of exemption. Moreover, even in the absence of the second two-acre rule, the Secretary was not powerless to police such unlawful claims.[32] Thus, reinstatement of the rule would not necessarily provide additional relief for the alleged deprivation. The possibility that retroactive reinstatement will cure the alleged widespread abuses of the Act is far too attenuated to support a conclusion that appellants have not yet received all the meaningful relief available.[33] The district court's order dismissing count I must be affirmed.
 
 IV. CONCLUSION
 
 44
 We conclude that SOCM's claims against the Secretary for failure to perform duties required by the Act (counts II and III of the complaint) are subject to the specific venue requirement in section 520(c)(1). We therefore affirm the district court's dismissal of these claims for lack of venue. We also affirm the district court's holding that appellants' claim of improper rulemaking in count I was rendered moot by the Secretary's subsequent procedurally correct promulgation of a superseding rule.
 
 
 45
 It is so ordered.
 
 
 
 *
 Judgment and Opinion vacated
 
 
 [1]
 The three organizations are Save Our Cumberland Mountains, Inc. (SOCM), Council of Southern Mountains, Inc., and Virginia Citizens for Better Reclamation. All three alleged that their members live near and have been adversely affected by coal mining operations. See Complaint, paragraphs 1-5, Joint Appendix (J.A.) at 6-8
 
 
 [2]
 For ease of discussion, the Secretary and the Director will be referred to as either "appellees" or "the Secretary."
 
 
 [3]
 This action was consolidated for purposes of oral argument and decision with case number 83-1224, 725 F.2d 1434, Save Our Cumberland Mountains, Inc. v. Clark
 
 
 [4]
 Under the Act, states may assume exclusive administration of surface mining regulations. In order to assume this role, a state must develop a program and obtain approval for its program from the Secretary. 30 U.S.C. Sec. 1253 (Supp. V 1981). If the state does not submit a program, or fails to enforce its program, the Secretary is authorized to prepare a federal program and assume administration. 30 U.S.C. Sec. 1254
 
 
 [5]
 The November 27, 1979 suspension deleted the following language from 30 C.F.R. Sec. 700.11(b): "any ... operation conducted by a person who affects or intends to affect more than two acres at physically unrelated sites within one year."
 
 
 [6]
 In this memorandum, President Reagan directed the Secretary of the Interior to postpone for sixty days the effective date of all final rules that were not yet effective. 46 Fed.Reg. 11,227 (1981)
 
 
 [7]
 The Secretary stated later that this notice of suspension was published in error. 47 Fed.Reg. 41, 47 (1982)
 
 
 [8]
 Suspension was proposed as a result of a preliminary review of the regulation pursuant to Executive Order No. 12291, which required that all major rules be accompanied by a regulatory impact analysis. Exec.Order No. 12,291, 46 Fed.Reg. 13,193 (1981), reprinted in 5 U.S.C. Sec. 601 (1982)
 
 
 [9]
 Section 517 of the Act, 30 U.S.C. Sec. 1267, requires the Secretary to make the inspections necessary to evaluate the administration of the State programs or to enforce any Federal program. Section 521, 30 U.S.C. Sec. 1271, outlines various enforcement mechanisms that the Secretary is required to initiate if he determines, on the basis of an inspection, that a violation exists
 
 
 [10]
 All parties agree that the proper venue for count I is the District of Columbia. Section 526(a)(1) of the Act, 30 U.S.C. Sec. 1276(a)(1), states: "Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, and 1273 of this title shall be subject to judicial review in the United States District Court for the District of Columbia Circuit."
 
 
 [11]
 The third two-acre rule became effective on September 1, 1982. 47 Fed.Reg. 33,424 (1982). The rule revises 30 C.F.R. Sec. 700.11(b) by outlining specific guidelines for determining whether two or more operations are related for purposes of determining whether they comprise more than two acres. Among other things, the rule employs a "control" test. Two or more operations are deemed related if they are under common ownership or control
 
 
 [12]
 Sections 520(a)(1) and (2) provide:
 (a) Civil action to compel compliance with this chapter
 Except as provided in subsection (b) of this section, any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter--
 (1) against the United States or any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution which is alleged to be in violation of the provisions of this chapter or of any rule, regulation, order or permit issued pursuant thereto, or against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter; or
 (2) against the Secretary or the appropriate State regulatory authority to the extent permitted by the eleventh amendment to the Constitution where there is alleged a failure of the Secretary or the appropriate State regulatory authority to perform any act or duty under this chapter which is not discretionary with the Secretary or with the appropriate State regulatory authority.
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties.
 
 
 [13]
 As it appears in the United States Code, the first portion of section 520(c)(1) reads: "Any action respecting a violation of this chapter ...." 30 U.S.C. Sec. 1270(c)(1). "This chapter" comprises the entire Act. As it appears in the Statutes at Large, the section reads: "Any action respecting a violation of this Act ...." Surface Mining Control and Reclamation Act of 1977, Pub.L. No. 95-87, 91 Stat. 447, 503 (1977)
 
 
 [14]
 We are not, of course, required to adhere to a literal reading of the statute if such a reading would undermine the expressed intent of Congress. See United States v. Babcock, 530 F.2d 1051, 1053 (D.C.Cir.1976). The legislative history of the Act, however, contains no discussion of the intended scope of the venue provision
 
 
 [15]
 See, e.g., 30 U.S.C. Sec. 1260(c) ("The applicant shall file with his permit application a schedule listing any and all notices of violations of [this Act] ...."); 30 U.S.C. Sec. 1267(e) ("Each inspector, upon detection of each violation of ... [this Act], shall forthwith inform the operator in writing ...."); 30 U.S.C. Sec. 1267(h)(1) ("Any person who is or may be adversely affected by a surface mining operation may notify the Secretary ... of any violation of [this Act] which he has reason to believe exists at the surface mining site.")
 
 
 [16]
 While it is conceivable that Congress envisioned that the typical citizens' action against the Secretary would "complain of" a small number of specific mining operations and did not anticipate the type of claim raised in this case, this possibility does not change our analysis. We must still adhere to the intent expressed by Congress through the language of the statute
 
 
 [17]
 The action in the instant case could conceivably involve site-specific issues. The Secretary contends that determination of the appropriate reclamation fee, for example, depends on the facts surrounding each site. See Brief for Appellees at 20-21
 
 
 [18]
 In this case, appellants have asserted jurisdiction under 28 U.S.C. Secs. 1331, 1337, 1361, 2201, and 2202 (1976 & Supp. V 1981)
 
 
 [19]
 The House bill passed on April 29, 1977, 123 CONG.REC. 12,888 (1977). The Senate, which had introduced its own bill, passed the House bill, with amendment on May 20, 1977. The Senate amendment substituted the text of the original Senate bill (S. 7) for the text of the House bill. 123 CONG.REC. 15,777-78 (1977)
 
 
 [20]
 Neither the floor debates nor the committee reports accompanying each version of the bill contain any discussion of the two venue provisions. The conference report on the compromise version of the bill merely states that the conferees adopted a blend of the House and Senate citizens' suits provisions. In its only reference to the citizens' suits provision, the report of the Conference Committee states:
 The House bill and the Senate amendment thereto had similar citizen suit provisions. The conferees adopted a blend of these two sections including the House language vesting jurisdiction in the Federal courts without regard to citizenship or jurisdictional amount (the Senate amendment is silent on this point) and a rewritten version of the Senate amendment's subsection (f) that establishes a right of action for injuries resulting from an operator's violation of any rule, regulation or order or permit issued under the act (the House bill contained no similar provision).
 H.R.REP. NO. 493, 95th Cong., 1st Sess. 110 (1977), U.S.Code Cong. & Admin.News 1977, pp. 593, 741.
 
 
 [21]
 Section 520(e) provides:
 Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any of the provisions of this chapter and the regulations thereunder, or to seek any other relief (including relief against the Secretary or the appropriate State regulatory authority).
 30 U.S.C. Sec. 1270(e).
 
 
 [22]
 The Senate version contained no such limiting language. This limiting language was advocated in letters to both the House and Senate from the Department of the Interior and the Department of Justice. The Department of Justice suggested this type of limiting language in order to assure that the regulatory authority would always receive 60 days' notice of suits, as provided in subsection 520(b)(2) of the Act. H.R.REP. NO. 218, 95th Cong., 1st Sess. 153 (1977)
 
 
 [23]
 Exactly what rights or remedies are preserved by this savings clause is unclear. In analyzing the saving clause in the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1365(e) (1976 & Supp. V 1981), which is substantially similar to section 520(e), the Supreme Court indicated that the provision is intended only to allow "enforcement of antipollution standards arising under other statutes or state common law." Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 20 n. 31, 101 S.Ct. 2615, 2626 n. 31, 69 L.Ed.2d 435 (1981). Thus, the citizens' suit provision may be the only source of jurisdiction for actions arising out of violations of the substantive provisions of the Act. Since we have interpreted the venue clause as applicable to any action respecting such violations, regardless of the source of jurisdiction alleged, we need not decide this issue
 
 
 [24]
 We emphasize that our holding in this case does not determine the appropriate venue for an action against the Secretary arising out of other statutes or laws
 
 
 [25]
 Although the citizens' suit provision in the FWPCA has been described as "virtually identical" to the provision at issue here, Milwaukee v. Illinois, 451 U.S. 304, 328-29 n. 21, 101 S.Ct. 1784, 1798-99 n. 21, 68 L.Ed.2d 114 (1981), there are some crucial differences. The notice provision that was at issue in Train provides:
 (b) No action may be commenced--
 (2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator ....
 33 U.S.C. Sec. 1365(b)(2) (emphasis added). The subsection (a)(2) referred to is the counterpart to section 520(a)(2).
 The venue provision of the FWPCA states:
 (c)(1) Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.
 33 U.S.C. Sec. 1365(c)(1) (emphasis added). In contrast to the venue requirement in the Surface Mining Control and Reclamation Act, both of these provisions refer only to actions brought under "this section"--that is, actions brought pursuant to the citizens' suit provision of the FWPCA.
 
 
 [26]
 Appellants do not claim that there was any procedural defect in promulgating the new rule
 
 
 [27]
 There is no question that a case can be mooted by promulgation of new regulations or by amendment or revocation of old regulations. See, e.g., Natural Resources Defense Council v. United States Nuclear Regulatory Comm'n, 680 F.2d 810 (D.C.Cir.1982) (promulgation of a rule in accordance with the APA's procedural requirements moots a claim that the same rule was previously promulgated without notice and comment); Sannon v. United States, 631 F.2d 1247 (5th Cir.1980) (promulgation of new regulations providing relief requested moots controversy)
 
 
 [28]
 In count I of the complaint, SOCM asserts that the suspension and withdrawal of the second two-acre regulation occurred without notice and comment and in violation of the Administrative Procedure Act. See Complaint paragraphs 11-18, J.A. at 9-10. In the last paragraph of count I, SOCM also alleges that the agency action was arbitrary and capricious and otherwise inconsistent with law. Throughout these proceedings, however, the only allegedly illegal agency actions that SOCM has identified were procedural in nature. See Brief for Appellants at 31 & n. 14. We therefore view appellants' attack on the withdrawal of the rule as solely procedural. Our analysis of the mootness issue is based on this characterization of SOCM's claim
 
 
 [29]
 In Natural Resources Defense Council v. United States Nuclear Regulatory Comm'n, 680 F.2d 810 (D.C.Cir.1982), a panel of this court held that repromulgation of a rule in accordance with the APA's procedural requirements moots a claim that the same rule was previously issued without notice and comment
 The court reasoned that although the petitioners were deprived of the opportunity to participate in the initial promulgation of the rule, they were "undeniably provided that opportunity ... when [the agency] repromulgated the rule in accordance with the requirements of ... the APA." Id. at 814. The court concluded that this opportunity provided the petitioner with " 'everything that it could recover.' " Id. at 814 (quoting California v. San Pablo & Tulare Railroad, 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893)).
 
 
 [30]
 We recognize that in some instances the opportunity to comment on a proposed withdrawal of a rule can be qualitatively different from the opportunity to comment on a proposed promulgation. See Consumers Energy Council of America v. FERC, 673 F.2d 425, 446 (D.C.Cir.1982). We do not believe that this difference is sufficient to mandate a conclusion that the controversy is not moot in the absence of the availability of additional, concrete relief
 
 
 [31]
 There is no question that an agency may initiate a new rulemaking proceeding to remedy a defective rulemaking. See Action on Smoking and Health v. CAB, 713 F.2d 795, 798 (D.C.Cir.1983). Assuming that appellants are correct in their assertion that the withdrawal of the second rule was procedurally defective, the Secretary could have remedied this defect by withdrawing the rule in compliance with the APA. In the alternative, there is no reason the Secretary could not have remedied the defect, as he did here, by promulgating a superseding rule
 
 
 [32]
 There were many options open to enforce the Act against those who allegedly claimed the exemption improperly. First, we note that throughout this entire series of events, a portion of the first two-acre rule remained in effect. While the appellants contend that the rule was not as complete in coverage as the second rule, the Secretary surely could have initiated enforcement proceedings against alleged violators. The fact that the Secretary apparently has not initiated such actions is an issue relevant to SOCM's claim, in counts II and III, that the Secretary has failed to enforce the Act. Moreover, the appellants themselves could have initiated citizen enforcement actions against those in violation of the Act under section 520(a)(1)
 
 
 [33]
 Appellants rely on Natural Resources Defense Council v. EPA, 683 F.2d 752 (3d Cir.1982), in asserting that the claim is not moot. In that case, the EPA deferred, without notice and comment, the effective date of certain amendments to regulations. NRDC filed suit seeking a review of this deferral. Subsequently, EPA published a notice terminating as of a future date the indefinite postponement of the amendment. The same day EPA published a notice of rulemaking and solicited comments on a proposed further suspension of the effective dates of the amendments. After proper notice and comment, the EPA decided to terminate the suspension of all but four of the amendments. The court concluded that the case was not moot, at least as to the four amendments that were still postponed, because of the possibility of reinstatement. Reinstatement, the court found, would change the status quo because the four amendments that were still postponed contained within them specific compliance dates or triggered further compliance obligations. In other words, reinstatement of the amendments would automatically and assuredly change the status quo because other deadlines would be affected. The situation in the case at bar is dramatically different. As noted in the text, reinstatement of the second two-acre rule will not automatically change the status quo