# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 19-1240**

**September Term, 2020**

FILED ON: MAY 4, 2021

NUCLEAR ENERGY INSTITUTE,
               PETITIONER

v.

U.S. NUCLEAR REGULATORY COMMISSION AND UNITED STATES OF AMERICA,
               RESPONDENTS

---

On Petition for Review of an Order
of the Nuclear Regulatory Commission

---

Before: MILLETT and PILLARD, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

## J U D G M E N T

The Nuclear Energy Institute petitions for review of a letter it received from the Nuclear Regulatory Commission on September 16, 2019. We considered the Institute's petition on the briefs and oral argument of the parties. After fully considering the issues, we determined a published opinion is not warranted. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the petition for review is **DISMISSED**.

We would have jurisdiction to hear the Institute's petition only if the 2019 Letter[1] were a "final order[]" within the meaning of that term in the Hobbs Act. 28 U.S.C. § 2342(4). Because the Letter is not a final order, we must dismiss the petition.

There are two conditions for finality. First, the challenged order must "mark the consummation of the agency's decisionmaking process," rather than being "tentative or interlocutory." *Blue Ridge Env't Def. League v. NRC*, 668 F.3d 747, 753 (D.C. Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177 (1997)) (cleaned up). We agree with the parties that the Letter was not tentative or interlocutory. The second requirement for finality is that the

---

[1] Letter from John W. Lubinksi, Nuclear Regul. Comm'n, to Ellen C. Ginsberg, Nuclear Energy Inst., ML19224A774 (Sept. 16, 2019).

order have "legal consequences," meaning it "imposes an obligation, denies a right, or fixes some legal relationship." *Id.* at 753 (quoting *Bennett*, 520 U.S. at 177 and *Nat. Res. Def. Council, Inc. v. NRC*, 680 F.2d 810, 815 (D.C. Cir. 1982)). This is where the Institute's petition fails.

The Institute asserts the 2019 Letter "finally altered the requirements for nuclear power plants to dispose of very low-level waste under the [Atomic Energy Act]," and thus imposed new obligations on the Institute's members. Pet'r's Br. 18. It is clear the Commission did alter these requirements at some point. In a 1985 opinion, the Commission's legal director analyzed the text, structure, and history of the Commission's regulations, and concluded the Commission had ceded jurisdiction over disposal of low-level waste to the Agreement States. The legal director determined the Commission was "not at liberty" to reclaim this authority "without a rulemaking proceeding, or by issuance of appropriate orders." The next year, the Commission notified its licensees of this understanding in Information Notice 86-90, stating: "[I]n Agreement States NRC approval is not necessary for disposal ... of low-level radioactive waste from a nuclear facility. Such approval is within the jurisdiction of the Agreement State." Nuclear Regul. Comm'n, *Information Notice No. 86-90: Requests to Dispose of Very Low-Level Radioactive Waste Pursuant to 10 CFR 20.302*, (Nov. 3, 1986). The Commission maintained this position for at least twenty-three years.[2] In the 2019 Letter the petitioner would have us review, however, the Commission expressed the opposite view.

When did this about-face occur? If it occurred prior to the 2019 Letter – that is, if the Letter merely restated the Commission's previously announced position – then the Letter is not a final order and not reviewable. *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 425-27 (D.C. Cir. 2004).

The Commission argues it changed tack in 2012 when it sent a letter to the Agreement States clarifying which approvals are necessary in certain scenarios where a regulated party wishes to dispose of low-level waste at a facility in another state. Nuclear Regul. Comm'n, *Clarification of the Authorization for Alternate Disposal of Material Issued Under 10 CFR 20.2002 and Exemption Provisions in 10 CFR (FSME-12-025)*, ML12065A038 (Mar. 13, 2012). But that letter did not purport to alter the approval process for intra-state disposal (which is the Institute's principal concern). And although the letter was phrased ambiguously in some respects, it is consistent with the approach prescribed in the 1986 Notice.[3] We conclude the

---

[2] In a draft guidance document published in 2009, the Commission advised: "For reactor licensees submitting § 20.2002 requests, if both the reactor and the proposed disposal facility are located in the same Agreement State, typically the State regulator will perform the review of the request, not NRC staff." Nuclear Regul. Comm'n, *EPPAD 3.5: Review, Approval, and Documentation of Low-Activity Waste Disposals in Accordance with 10 CFR 20.2002 and 10 CFR 40.13(a): Draft for Interim Use* 15, ML092460058 (superseded Oct. 2017).

[3] Scenario 4, for example, states that where an "NRC licensee requests authorization under 20.2002," the Commission would need to approve the request. FSME-12-025, at 2. Under either the old or new approach, this would be the process for an NRC licensee in a non-Agreement State. The letter does not say whether NRC licensees in an Agreement State may use their state's 20.2002-equivalent provisions.

change did not occur in 2012.

Alternatively, the Commission argues the change came in 2016, when it published Regulatory Issue Summary 16-11 (the RIS). There, the Commission announced to all its licensees that the 1986 Notice was "incorrect[]" and therefore superseded. The RIS "clarifi[ed]" that "any licensee's request for approval to dispose of" low-level radioactive waste "must be submitted to the regulatory authority that issued the license for use of the radioactive material." For nuclear power plants, because the Commission is the licensing authority, "this request should be made to the NRC."

Despite the seeming clarity of the above-quoted passages, the Institute argues the RIS did not actually finalize the Commission's change in interpretation, pointing to three disclaimers in that document:

- "The NRC expects recipients to review the information for applicability to their facilities and to consider actions, as appropriate. However, this RIS requires no specific action or written response on the part of an addressee."

- "Any action that licensees take to implement changes or procedures in accordance with the information contained in this RIS ensures compliance with current regulations, is strictly voluntary, and, therefore, is not a backfit."

- "A notice of opportunity for public comment on this RIS was not published in the *Federal Register* because it is informational and pertains to a staff position that does not represent a departure from current regulatory requirements and practice."

According to the Institute, these equivocations left its members unsure whether the RIS was announcing "a mandatory, enforceable regulatory requirement" for nuclear power plants with Agreement State approvals. Pet'r's Br. 32; *but see Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000) (holding boilerplate disclaimers of legal effect are not dispositive). Even if we were to agree with the Institute's understanding of the RIS as not a final order – an issue we do not reach – we would still have to dismiss its petition.

The Commission was unequivocal about its new position two years later. In 2018, during a safety inspection, the Commission's staff informed the South Texas Project Nuclear Operating Company it was not in compliance with the RIS, and the Commission was "considering issuing a minor violation." South Texas, a member of the Institute, wrote to the Commission for clarification, explaining its method for disposing of the low-level wastes in question had been approved by the State of Texas prior to 2016. When the Commission wrote back to South Texas on October 31, 2018, it stuck to its position that, by law, South Texas must seek approval from the Commission, authorization from the State notwithstanding. Pet'r's Br. 15 ("NRC thus took the position," in the response to South Texas, "that an existing, otherwise sound Agreement State approval could not be relied upon by a licensee"). The Commission did not issue a minor violation and assured South Texas it would "continue to exercise enforcement discretion ... while the NRC staff evaluates regulatory options," but that forbearance casts no doubt upon the

Commission's position in 2018, which is clearly contrary to its original 1986 position.[4]

To be sure, the response to South Texas was not public nor was it addressed to "the industry at large." Pet'r's Br. 29. The Institute, however, had become aware of it by February 2019. *See* Letter from Ellen C. Ginsberg, Nuclear Energy Inst., to Ho Nieh, Nuclear Regul. Comm'n, at 1, 9-10 (Feb. 28, 2019) (discussing the Commission's response to South Texas); *cf. Brotherhood of Locomotive Eng'rs and Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 105-07 (D.C. Cir. 2020) (holding the time to challenge a final order runs from actual notice to the aggrieved party). Therefore, by February 2019, the Institute was aware the Commission considered the RIS to be mandatory and enforceable.

The Institute nonetheless argues this case is controlled by *Barrick Goldstrike Mines Inc. v. Browner*, where we said "a series of agency pronouncements," including "a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action" for purposes of the Administrative Procedure Act. 215 F.3d 45, 49 (2000).[5] Assuming this dictum applies to finality for purposes of the Hobbs Act, and further assuming the Commission's position was still uncertain after the 2016 RIS, it follows only that the Commission's position was not final until it responded to South Texas. Indeed, the point made in *Barrick Goldstrike* is that an initially non-binding guidance can harden into final agency action when the agency threatens enforcement, *see id.*; *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006) (explaining *Barrick Goldstrike* thus); here the Commission threatened enforcement in 2018.

Coming as it did after the RIS and the response to South Texas, the 2019 Letter imposed no new obligations on anyone. The Institute points out that the Letter said "any licensee's request ... must be submitted to the regulatory authority that issued the license for the use of the radioactive material," but that was not news; as the Institute well knows, the Commission was there quoting the RIS. It then explained that "this requirement is based on the NRC's jurisdiction over the operation of nuclear power plants, which cannot be delegated" – its first attempt at a legal rationale for its changed position. But "legal novelty" is not a legal effect and does not "establish[] finality." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 537 (D.C. Cir. 2019). Next it stated the staff intended to work with industry on a "streamlined approach" to this problem in the future, but that did not make its position any less binding in the present. Finally, the Letter stated the Commission would "consider enforcement discretion on a case-by-case basis." Yes, as the Institute notes, "enforcement discretion" implies the Commission viewed its

---

[4] The Commission also noted in the response: "[South Texas] has raised issues associated with the RIS and with prior guidance. The NRC is evaluating the issue generically to provide further clarity." The Institute asserts this was a signal that "NRC might well change course" again. That has no bearing on whether the agency's position was final in 2018. *See Appalachian Power*, 208 F.3d at 1022 ("EPA may think that because the Guidance ... is subject to change, it is not binding and therefore not final action.... But all laws are subject to change.").

[5] The enforcement letter in *Barrick* was a warning, much like the response to South Texas. *See* Appellant's Br. 6, Barrick Goldstrike, Inc. v. Browner, 215 F.3d 45 (D.C. Cir. 2000) (No. 99-5298), 2000 WL 35585350.

position as enforceable but, as we have seen, that had been made express in the response to South Texas in 2018.

In sum, all the 2019 Letter did was confirm the Commission's adherence to the position it had previously taken: "It left the world just as it found it." *Indep. Equip. Dealers*, 372 F.3d at 428. As a result, it was not a final order and we lack jurisdiction to review it.

The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(b).

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:  /s/
Daniel J. Reidy
Deputy Clerk

5